## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| KOLORFUSION INTERNATIONAL, INC. | ) | Case No. 10-28857 ABC |
| | ) | Chapter 11 |
| Debtor. | ) | |

### SECOND AMENDED DISCLOSURE STATEMENT

Kolorfusion International, Inc., ("Debtor" or "Kolorfusion") a Colorado corporation, filed its Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado in the above-captioned proceeding on May 23, 2011   (hereinafter "Plan of Reorganization" or "Plan").   A confirmation hearing has been scheduled for _____ at _____ _.m. in Courtroom C205, in the Rogers Courthouse, 1929 Stout Street, Denver Colorado 80294. Pursuant to the terms of the United States Bankruptcy Code, the Bankruptcy Court   approved this Disclosure Statement (hereinafter "Disclosure Statement") on _____, 2011. The approval of the Bankruptcy Court is required by statute but does not constitute a judgment by the Court as to the desirability of the Plan of Reorganization or as to the value or suitability of any consideration offered thereby.

The Debtor has prepared this Disclosure Statement to disclose that information which, in its opinion, is material, important and necessary for an evaluation of the Plan of Reorganization. The material herein contained is intended solely for that purpose and solely for the use of known creditors and interest holders of the Debtor, and, accordingly may not be relied upon for any purpose other than determination of how to vote on the Plan of Reorganization.

**A CREDITOR OR INTEREST HOLDER ASSERTING A CLAIM IN ORDER TO VOTE ON THE PLAN OF REORGANIZATION, MUST HAVE FILED A PROOF OF CLAIM OR INTEREST AT OR PRIOR TO JANUARY 28, 2011, UNLESS SCHEDULED BY THE DEBTOR AS NOT DISPUTED, LIQUIDATED AND NOT CONTINGENT. ANY CREDITOR SCHEDULED AS NOT DISPUTED, LIQUIDATED AND NOT CONTINGENT IS, TO THE EXTENT SCHEDULED, DEEMED TO HAVE FILED A CLAIM, AND, ABSENT OBJECTION, SUCH CLAIM IS DEEMED ALLOWED. YOU ARE ADVISED TO REFER TO THE SCHEDULES ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT TO DETERMINE THE EXTENT TO WHICH YOUR CLAIM IS SCHEDULED AND IF IT IS DISPUTED, UNLIQUIDATED OR CONTINGENT. A CREDITOR OR INTEREST HOLDER MAY VOTE TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION BY FILLING OUT AND MAILING THE BALLOT WHICH IS PROVIDED WITH THIS DISCLOSURE STATEMENT TO THE ATTORNEYS FOR THE DEBTOR, LAW OFFICE OF BONNIE BELL BOND,**

**LLC, 5613 DTC PARKWAY, SUITE 1200, GREENWOOD VILLAGE, COLORADO 80111.**

The Court has fixed _____, 2011 at **5:00 p.m.** as the last date by which ballots must be delivered to Law Office of Bonnie Bell Bond, LLC. No vote received after such time will be counted. Whether a creditor or interest holder votes on the Plan or not, such person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of classes of creditors and interest holders and/or is confirmed by the Court. Absent some affirmative act constituting a vote, such creditor or interest holder will not be included in the tally. Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of the claim or interest will be allowed or disallowed for distribution purposes.

In order for the Plan to be accepted by creditors, a majority in number and a two-thirds majority in amount of claims filed or deemed allowed of each class of creditors must vote to accept the Plan. For purposes of determining whether the requisite majorities are achieved, the computation will be based upon the total number of claims or interests actually voting rather than on the total number of claims approved and allowed. You are, therefore, urged to fill in, date, sign and promptly mail the enclosed ballot. Please be sure to properly complete the form and legibly identify the name of the claimant or interest holder.

The Debtor or others may solicit your vote. The cost of any solicitation by the Debtor will be borne by the Debtor.   No representative of the Debtor shall receive any additional compensation for any solicitation.

No representations concerning the Debtor or the Plan of Reorganization are authorized by the Debtor other than as set forth in this memorandum.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible instruments or are digests of other instruments. While the Debtor has made every effort to retain the meaning of such other instruments, the Debtor urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves.

I. **DEFINITIONS**

All capitalized terms used herein shall have the respective meanings set forth below or otherwise assigned in the Plan.   All other terms shall have the meanings assigned to such terms in the Bankruptcy Code or the Bankruptcy Rules, or if none, by common usage.

"Administrative Expense" shall mean any cost or expense of administration of Chapter 11 allowed under 11 U.S.C. § 503(b) of the Code.

"Affiliate" shall mean any entity affiliated with the Debtor pursuant to 11 U.S.C. § 101(2).

"Allowed Claim" shall mean (a) an unsecured claim against the Debtor which is set forth in the Debtor's schedules other than an unsecured claim against the Debtor scheduled by the Debtor as disputed, contingent or unliquidated; (b) an unsecured claim against the Debtor which has been filed pursuant to 11 U.S.C. § 501, and with respect to which no objection to the allowance thereof has been interposed within the deadlines set forth in Article X of this Plan, or as to which any objection has been determined by Final Order; provided however, that interest accrued on or after July 27, 2010 shall not be a part of any Allowed Claim.   Allowed Claims may include, but are not limited to, claims that arise from the rejection of executory contracts.

"Bankruptcy Code" or "Code" shall mean Title II of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101, et seq., as amended.

"Chapter 11" shall mean Chapter 11 of the Code.

"Claim" shall mean a claim against the Debtor as defined in 11 U.S.C. § 101(5).

"Code" shall mean the Bankruptcy Code, 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"Company" shall mean Kolorfusion International, Inc., which may also be referred to as the "Debtor" or "Reorganized Debtor."

"Confirmation" shall mean the entry by the Court of an order confirming the Plan in accordance with Chapter 11 of the Code.

"Consensual Plan" shall mean the confirmation of the Plan with the acceptance of all classes of creditors required to vote on the Plan.   The Plan shall receive the acceptance of all classes of creditors provided two-thirds majority in the dollar amount of claims voting and a majority in number of claims voting vote to accept the Plan.

"Contested Claim" shall mean shall mean any Claim which has been scheduled by the Debtor as disputed, contingent, or unliquidated or any Claim as to which an objection to the allowance thereof has been or will be filed within the deadline for filing of such objections set forth in Article X of the Plan. Contested Claims shall be treated under the provisions of Article X of the Plan until allowance or disallowance of such claim has been determined by a Final Order. Contested claims include claims which the Debtor believes should be objected to in whole or in part.

3

"Court" shall mean the United States District Court for the District of Colorado in Bankruptcy.

"Cramdown" shall mean confirmation of the Plan under the provisions of the Bankruptcy Code which permit the Court to confirm the plan even if one or more impaired classes vote against the Plan, provided the Plan is fair and equitable, the rejecting class is afforded certain treatment defined by the Bankruptcy Code, and at least one impaired class of creditors votes to accept the Plan by a two-thirds majority in the dollar amount of claims voting and a majority in number of claims voting.   In order to be fair and equitable with respect to the unsecured creditors, the Plan must either provide the rejecting class of creditors the full value of their claim or if they do not receive the full value of their claims, no junior class of creditor or interest holder may receive or retain anything on account of their claims or interests.

"Cramdown Plan" shall mean a Plan which is confirmed through Cramdown.

"Creditors Committee" shall mean the committee of creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code.

"Debtor" and "Debtor-in-Possession" shall mean Kolorfusion International, Inc., which shall also be the Reorganized Debtor.

"Disclosure Statement" shall mean the Disclosure Statement describing the Plan as required to be filed by the Debtor, the proponent of the Plan, approved by the Court, and distributed to the various classes under the Plan as provided in 11 U.S.C. § 1125.

"Effective Date"shall mean the first business day following thirty (30) days after the date the order confirming the Plan becomes final.

"Final Order" shall mean an order or a judgment as to which the time to appeal or seek review or rehearing has expired. In the event that an appeal or petition for rehearing is filed, an order or judgment shall be final unless an Order enters granting a stay pending appeal or petition for rehearing.

"Impaired"     A class of claims or interests is "impaired" in accordance with 11 U.S.C. §1124 if the Plan alters the legal, equitable and/or contractual rights of the holders of such claims or interests.

"Net Profits" shall mean the Debtor's revenues received from gross sales, reduced by cost of goods sold, operating and administrative expenses, interest, taxes and payments to the Allowed Class 1, 2, 3, 4 and 5 Claims.   In calculating Net Profits, the amount is not reduced by depreciation or amortization expenses.   In the event the Debtor pursues any preference claims

4

or voidance actions under the Bankruptcy Code, the net proceeds, after payment of legal fees and expenses, will be included in the calculation of Net Profits.

"Net Profits Fund" shall mean that fund established by the Debtor funded by 50% percent of its Net Profits, calculated monthly, to make payments due to the Class 9 claimants under the Plan.

"Plan of Reorganization" shall mean the Plan of Reorganization, as it may be amended, submitted by the Debtor, Kolorfusion International, Inc..

"Post-petition" shall mean any time on or subsequent to July 27, 2010.

"Pre-petition" shall mean any time prior to July 27, 2010.

"Pro Rata" shall mean with respect to any claimant, the percentage which the Allowed Claim of a creditor bears to the sum of all Allowed Claims in the same class as such Allowed Claim.

"Reorganized Debtor" shall mean Kolorfusion International, Inc.

"Unimpaired" A class of claims or interests is "unimpaired" in accordance with 11 U.S.C. §1124 if the legal, equitable and/or contractual rights of the holders of such claims or interests are not altered under the Plan.

## II.     FORMATION OF DEBTOR AND DEVELOPMENT OF BUSINESS

### A.     FORMATION OF DEBTOR AND DEVELOPMENT OF BUSINESS

#### 1.     Formation of Kolorfusion International, Inc.

Kolorfusion is a corporation organized under the laws of the State of Colorado on May 17, 1995.

#### 2.     Operations of the Debtor.

Kolorfusion markets a patented system for transferring colors and patterns into coatings on metal, wood, glass, and directly onto plastic products. "Kolorfusion" is a process that allows the transfer of colors and patterns into coated metal, wood and glass and directly into plastic surfaces of virtually any shape or size. The creation of a pattern to be a part of a product's surface is designed to enhance consumer appeal, create demand for mature products, achieve product differentiation and customization and as a promotional vehicle.

5

The process uses a transfer material ("KolortexTM") with special inks that may be of any design or color that the user desires.    The only limitations are the imagination and desires of the customer.    The Kolortex is placed around the product.    The product, wrapped in the Kolortex, is then placed in a carrier that allows for a total vacuum.    The carrier is then placed in a heating chamber which allows the inks the leave the Kolortex and penetrate into the coated product.

The Debtor maintains a processing center at which it performs the Kolorfusion process on products for customers.    The Debtor has also entered into License Agreements with manufacturers to enable the manufacturer to utilize the process for their specific product. The license agreements typically cover five year terms, renewable for up to twenty years.    Under the license agreements, the Debtor charges a royalty for each product utilizing its process.

### 3.    Patents

The Debtor has obtained five (5) patents[1]. The original process patents for the United States and Canada were purchased from the inventor in 1995, and additional related patents were subsequently developed by Debtor.

The patents obtained by the Debtor include:
1)  U.S. Patent No. 5,308,426 – "Process of Decoration by Sublimation" –
filed November 16, 1992, issued May 3, 1994 expires November 16, 2012
2)  Canada Patent No. 2,082,979 – "Process of Decoration by Sublimation" –
filed November 16, 1992, issued March 26, 1996 expires November 16, 2012
3)  U.S. Patents Nos. 5,893,964 and 5,798,017 "Devices for Sublimating"
filed November 26, 1997, issued April 13, 1999 expires November 26, 2017
4)    U.S. Patent No. 5,962,368 – "Sublimation Using Heat Shrink Film" –
Filed June 3, 1998, issued October 5, 1999 expires June 3, 2018.

Four of the five patents the Debtor has obtained are current.    The Debtor has discovered that U.S. Patent No. 5,798,017 has expired for failure to pay maintenance fees.    The Debtor never received any notification regarding the due date for the maintenance fees.    The Debtor has been advised by patent counsel that this patent can be recovered.    While this patent is not utilized by the Debtor in its operations, the Debtor believes that it is advisable to maintain this patent and will be retaining patent counsel to assist in these services.

---

[1]  The Schedule B filed by the Debtor states that the Debtor holds 30 sublimination patents.    The listing of 30 patents is a typographical error, the statement should have read that the Debtor holds 3D sublimination patents. An amended Schedule B has been filed to correct this inadvertent error.    The Debtor has never had more than 5 patents.

The Debtor additionally possesses significant know-how, without which the utilization of its process is limited. The Debtor may acquire and/or develop additional related patents in the future.

### 4.    Facilities - Offices

At the time of the filing of the petition, the Debtor was leasing its business premises located at 16075 E. 32nd Avenue Suite A, Aurora, CO 80011. The lease expired on December 31, 2010, but was extended by the Landlord until April 30, 2011.

Debtor believes it is in the best interests of the estate to reduce its lease expense and has therefor entered into a new lease with First Industrial, L.P., a Delaware limited partnership, for approximately 20,671 square feet property located at 5401 Oswego Street, Unit C, Denver, Colorado.    The terms of the Lease were approved by Order of the Bankruptcy Court dated January 6, 2011 approved *nunc pro tunc* December 28, 2010.    The parties have entered into an Amendment to the Lease Agreement extending the commencement date of the Lease until April 22, 2011 and extending the term of the Lease through September 30, 2016.    Base Rent is abated from April 22, 2011 through September 30, 2011.    Common area expenses are also abated from April 22, 2011 through June 20, 2011 and starting July 1, 2011, through the end of the term of the Lease, the Debtor shall be responsible for its pro rata share of common area expenses currently estimated to be $2,928.39 per month.    Monthly base rent under the Lease shall be as follows:

| | |
|---|---|
| April 22, 2010-September 30, 2011 | $0 |
| October 1, 2011-September 30, 2012 | $4,909.36 |
| October 1, 2012-September 30, 2013 | $5,340.01 |
| October 1, 2013-September 30, 2014 | $5,770.65 |
| October 1, 2014-September 30, 2015 | $6,115.17 |
| October 1, 2015-September 30, 2016 | $6,459.69 |

Debtor will be responsible for all utilities for the leased premises.    Debtor has provided the Landlord with a Security Deposit in the amount of $26,686.59 with $8,895.53 to be refunded after year one and $8,895.53 to be refunded after year two provided Debtor is not in default.

Debtor will have 2 options to renew the lease for three year terms at a Market Rental Rate.

### 5.    Employees and Benefits

The Debtor currently has eight employees. The Debtor provides its employees with health insurance and dental insurance benefits.    There are presently no retirement benefits.

6.    **Financing**

The Debtor does not have operating lines of credit.    The Debtor finances its operations from its operating revenues.    It also has entered into exclusivity agreements with certain customers such as the agreement recently entered into with Excel Dryer.    Under the terms of the exclusivity agreements, the Debtor agrees to provide its services to only one customer within a particular industry.    The customer provides the Debtor with a deposit.    The Debtor agrees to provide its services to the customer on an agreed upon discounted basis recaptured from the deposit.    If the customer does not recapture the entire deposit within the term of the exclusivity period, the deposit is forfeited to the Debtor.    The recent agreement with Excel Dryer extending through December 2013 provided the Debtor with a deposit of $75,000.

7.    **Status of SEC Compliance**

The Debtor's common stock started trading on the OTC Bulletin Board in April 1998. The Debtor has not been able to file its periodic reports required under Section 13(a) of the Securities Exchange Act of 1934 since 2008 because it has not had the funds available to retain professionals needed to conduct the necessary investigation, compile the required information and prepare the reports.    Certain other reports may not have been timely filed.

Computershare Trust Company, the Debtor's former transfer agent, has placed the Debtor on inactive status and is no longer serving as transfer agent or registrar.

The Debtor's stock is currently de-listed but has not been de-registered by the Securities Exchange Commission.    In order to become actively traded, the Debtor will be required to bring its filings current with the Securities Exchange Commission which will require significant legal and accounting fees. At this time, the Debtor is focusing its resources on reorganizing its business operations and addressing its debt obligations, so it is not projecting that it will expend the funds to bring the SEC filings current in the foreseeable future.

8.    **Competition**

There is no presently no direct competition because the Debtor utilizes a patented process that is unique in the market. As discussed above, the patents will expire from November 2012 to June, 2018.    Once the patents have expired there may be direct competition from other companies that will be able to utilize the technology from the expired patents.    However, as further discussed above, the Debtor additionally possesses significant know-how, and it may not be practical for other companies to enter into competition with the Debtor without such know-how.    The Debtor believes that its unique know-how, developed over years, will continue to give it an advantage over any potential competitors and will help it maintain and build its customer base. In addition, the Debtor has developed, together with its suppliers, raw goods specifically for the process, and having made many improvements over the years, such raw

goods are protected by agreements with suppliers, along with the advantage to the Debtor of high volume pricing. Finally, as also mentioned above, the Debtor may acquire and/or develop additional related patents in the future.

There are companies that are near direct competition.    The most direct competition is "cubic printing" also known as hydrographics.    This is a technology from Japan that has had over 65 licensees in 22 countries.    Cubic printing uses a film of patterns and colors floating on a water bath, so that when a product is dipped through the bath, the film attaches to the product's surface, which is then over-coated with a spray on coating.    This system may often be quoted in the market at a higher cost than the Kolorfusion process and without the capability of full three dimension printing.    As with all superficially applied decoration processes, durability and abrasion resistance is inferior with Cubic printing to the Debtor's process. Cubic printing is mostly limited to the esthetic segment of the decoration market because the graphic and the alignment of the graphic may distort when applied. Cubic printing also requires an overcoat and lead times to obtain new designs may be extensive. Several of the Debtor's customers formerly used the cubic process.

In mold decoration covers all decoration technologies that are applied to injection molded parts as part of the molding process.    In mold decoration does not compete directly with the Debtor because it is limited to plastic parts with high volumes, usually small in size.

Indirect competition can be defined very broadly to include pad printing, screen printing, hot stamping, specialty paints and coatings.    All are surface decorations and are therefore prone to scratching.    All serve both esthetic and decorative market segments, except specialty paints and coatings, which includes textures and suspensions of glitter or metallic flakes.    Other decoration methods such as silk screening or decals have limited utilization as the cost and/or durability make them non-competitive for most dimensional decoration requirements.

## B.    MANAGEMENT & RELATED ENTITIES

### 1.    Management & Key Management Employees

#### Current Management

The Debtor's board of directors is currently comprised of two members: Mr. Thomas Gerschman and Mr. Thomas LeFort.

Thomas Gerschman serves as a director and Chief Executive Officer of the Debtor.    Mr. Gerschman has been a director and the chairman of the Debtor's board of directors since 1999. Mr. Gerschman has assisted in corporate finance matters and with strategic European relationships.    Mr. Gerschman has extensive background in investment banking and additional experience in manufacturing of plastic products.

9

Thomas LeFort has been a director since 2004 and serves as Chief Financial Officer of the Debtor.   Mr. LeFort brings over 15 years of experience in managing small and medium size businesses. For 7 years he ran a printing company that used a similar printing technology as the Debtor.

Bryan Chambers serves as the Debtor's Director of Engineering and overseas its day to day operations.

### Former Management and Dispute

When the Debtor was initially formed, Stephen R. Nagel served as President and a member of the board of directors.   A special meeting of the board of directors was held on February 13, 2009 at which Mr. Nagel was removed as president and officer of the Debtor and Kenneth Bradley was removed as Secretary of the Debtor.   Mr. Nagel initially disputed the validity of the actions taken at the February 13, 2009 special meeting and attempted to remove Mr. Gerschman from the Board of Directors and to appoint a new director in his place.   The Debtor commenced litigation in the Arapahoe County District Court, Case No. 2009CV463 on February 23, 2009 to resolve disputes over the management of the Debtor.   A settlement was reached in that litigation dated February 26, 2009 pursuant to which Mr. Nagel agreed that the February 13, 2009 special meeting was properly noticed and held and that he no longer served as President or any other officer of the Debtor.   On May 28, 2009, Mr. Nagel resigned his position on the Debtor's board of directors.

### 2.      Obligations owing to and from Managers, Insiders and Affiliates

Mount Keen & Co., Inc.

Mount Keen & Co, Inc., is a New York corporation owned and operated by Thomas Gerschman. The Debtor and Mount Keen entered into an agreement dated November 1, 1998 pursuant to which Mr. Gerschman, through Mount Keen, would serve as Chairman of the Board and would further provide consulting services to the Debtor on a non-exclusive basis, including services related to future financing of the Debtor's operations, communications and negotiations with existing and future investors and communications and negotiations with the inventor of the Debtor's technology.   The agreement provided that Mount Keen was to be paid $90,000 per year, $60,000 payable in monthly installments of $5,000 and the remainder to be paid through issuance of stock. In addition, Mount Keen is to be reimbursed for its related business expenses. The Debtor has failed to make payments due under the agreement.   The Debtor has scheduled the claim of Mount Keen in the amount of $870,336 due on the date of the petition, including simple interest at the rate of 8% per annum.   This amount does not include amounts for fees payable in shares of the Debtor.

A dispute has existed between Mount Keen and the Debtor's former President Stephen Nagel regarding the amounts due under the agreement. For the Debtor's fiscal year ending 2006, Mr. Nagel, without the consent of Mount Keen or the Board of Kolorfusion, reduced the amount accrued to cover the agreement from $683,373 to $333,373 contending that Mr. Gerschman had not provided services under the Mount Keen agreement. Furthermore, for subsequent years Mr. Nagel did not accrue any further amounts due under this agreement.   Mount Keen and Mr. Gerschman have repeatedly disputed such actions by Mr. Nagel, based on which there are now disputes as to the allowance of Mount Keen's claims by certain creditors in the case. These creditors have raised disputes that the claim may be barred by the statute of limitations.   Mount Keen disputes these allegations and intends to defend its claim.

## III.   EVENTS LEADING TO FILING OF CHAPTER 11

As previously discussed, in February 2009 at a special board meeting, Mr. Stephen Nagel was removed as President of the Company. Mr. Nagel initially disputed the validity of the actions taken at the February 13, 2009 special meeting and attempted to remove Mr. Gerschman from the Board of Directors and to appoint a new director in his place.   The Debtor commenced litigation in the Arapahoe County District Court, Case No. 2009CV463 on February 23, 2009 to resolve disputes over the management of the Debtor.   A settlement was reached in that litigation dated February 26, 2009 pursuant to which Mr. Nagel agreed that the February 13, 2009 special meeting was properly noticed and held and that he no longer served as President or any other officer of the Debtor.

Following the removal of Mr. Nagel, a lawsuit was commenced in the Arapahoe County District Court against the Debtor by Mr. Nagel's son Austin Nagel demanding payment of loans made to the Debtor by Austin Nagel.   The matter was set for trial on July 28, 2010.   The lawsuit has been stayed by the District Court pending the outcome of this Chapter 11 case.

The company had operated at a loss for many years under prior management, and the litigation expenses put a strain on the Debtor's ability to meet its obligations.   Further, the Debtor had entered into leases that were too costly and unnecessary for its operations.

The bankruptcy case was filed to stay the litigation by Austin Nagel and to preserve the assets of the Debtor for the benefit of all creditors. In addition, the Chapter 11 case will enable the Debtor to reduce its overhead and administrative expenses.

## IV.   OPERATIONS SINCE FILING OF CHAPTER 11

Following its Chapter 11 filing, the Debtor has continued its efforts to reduce operational costs, while repositioning itself for future growth During the course of the Chapter 11 case, the Debtor has essentially broken-even.   Compared with operational costs under prior management, significant cost reductions have been achieved in key areas such as rent, personnel and

11

professional fees (with the exception of such fees necessitated by events leading to the Chapter 11 filing, and to the Chapter 11 filing itself). After months of preparations, the Debtor's entire processing operation and all personnel have been moved and installed in the Debtor's new location during this month of May, 2011.The Debtor incurred significant expense related to the move but has a significantly reduced rent expense going forward. The Debtor's revenues and expenses during the pendency of the Chapter 11 case are set forth in Exhibit C attached hereto.

At the same time, the Debtor is pursuing numerous sales and business development opportunities, both with existing customers and licensees, as well as with new interested parties. The Debtor's recent signing of an exclusivity agreement with Excel Dryer, as mentioned above, is a result of such efforts. While during the events leading to the Chapter 11 filing, and following the Chapter 11 filing, the Debtor, with limited resources, has needed to expend significant time and moneys in managing and administrating many Chapter 11 related matters. The Debtor believes that its emergence from the Chapter 11 process will allow it to focus its resources more fully on growth opportunities.

On June 28, 2011, the United States Trustee appointed an Unsecured Creditors Committee in the case. Although the case was originally filed as a Small Business Debtor case as defined in Section 101(51D) of the Bankruptcy Code, the Debtor believes that following the appointment of the Creditors Committee that this case ceased to be that of a Small Business Debtor.

## V.    PENDING OR POTENTIAL LITIGATION CLAIMS

**Pending Litigation Claims**.

At the time of the filing of the petition, the only pending litigation was the lawsuit filed by Austin Nagel against the Debtor.    The litigation was stayed by the automatic stay.

**Potential Litigation Claims.**

There are potential preference claims which the Debtor has the right to pursue under the Bankruptcy Code.    The Bankruptcy Code permits the Debtor to recover payments during the 90 days prior to the filing of the bankruptcy proceeding to non-insider creditors and during the year prior to filing to insider creditors.    The recovery of these payments is subject to potential defenses, such as the payments were made in the ordinary course, the recipient made subsequent transfers to the debtor or the payments were a contemporary exchange for goods or services.

Many of the payments made by the Debtor were made in the ordinary course of business. The Debtor has not conducted an extensive preference analysis, and at this point does not anticipate filing claims to recover preferential transfers.

During the year prior to the filing of the petition, the Debtor made payments to Mount Keen in the total amount of $44,539. Some or all of these payments may be voidable as preferential transfers but the Debtor also believes that the recovery of these amounts would be subject at least in part to defenses by Mount Keen. Mount Keen made transfers back to the Debtor within the year prior to the filing of the petition which the Debtor believes under a defense of subsequent new value would reduce any preferential recovery to $6,539. In addition, Mount Keen may assert defenses that the payments were made in the ordinary course of business.

## VI.    FINANCIAL DISCLOSURES

Attached hereto as Exhibit A is the Debtor's pro forma Balance Sheet as of June 30, 2010. Exhibit B contains the Debtor's pro forma Profit and Loss Statement for the 12 month period ending   June 30, 2010. Attached hereto as Exhibit C are the projected Statements of Operations during the life of the Plan, including actual revenues and expenses for the periods August 2010 through April 2011.

## VII.    PLAN OF REORGANIZATION

The Plan has been provided to all creditors or possible creditors known to the Debtor. As described more fully herein, the Plan provides for the acquisition of all assets of the Debtor by the Reorganized Debtor, free and clear of all liens, claims and interests of creditors, equity holders, and other parties in interest except as otherwise provided in the Plan.

The payments under the Plan will be funded through the operation of the Debtor's business.    The Debtor believes that its operating income will be sufficient to make payments under the Plan and to operate the Reorganized Debtor. **The Debtor's Projections for the 5 years following confirmation of the Plan are set forth in Exhibit C.**    The assumptions utilized by the Debtor in formulating the projections are set forth following the projections. The Projected Statements of Operations are based upon the Debtor's historical cash flow, its operations during the Chapter 11 and management's expectation of future cash flow.   Under the Plan, the Debtor will contribute 50% of its Net Profits to the Net Profits Fund.    The remaining 50% will be retained by the Company to meet its working capital needs.    The Debtor believes that the 50% retained working capital fund will enable it to meet its working capital needs to sustain the growth in operations that it has projected.

The Debtor estimates that at confirmation it will need approximately $73,426.26 to make the payments due to the Administrative Expense Claims on the Effective Date comprised of the claims of counsel for the Debtor, and any other professionals retained in the case. The Debtor estimates that the total professional fees incurred in the case will be $57,000.00 but that portions of the fees will be paid through interim fee applications.    The Debtor does not anticipate that there will be any outstanding administrative claims held by the IRS, the Colorado Department of

13

Revenue or trade creditors as the Debtor remains current in its post-petition obligations. To the extent there are allowed administrative claims of any other nature, the amount outstanding shall be payable on the Effective Date as an unpaid administrative expense.

In addition, the Debtor will need to make the payments of its priority wage claims, payments to cure the leases it intends to assume as well as the payments to the Class 8 unsecured creditors on the Effective Date or shortly thereafter.

The payments due on the Effective Date are as follows:

| | |
|---|---|
| Unpaid Administrative Expenses | $45,190.00 |
| Class 1 Priority Wage Claims | $26,643.89 |
| Class 7 Assumed Lease Agreements Cure | $0 |
| Class 8 Payments to Administrative Convenience Class | $1,592.37 |
| | |
| Total obligations due on the Effective Date | $73,426.26 estimated |

The Debtor projects that it will have sufficient cash on the Effective Date to fund the payments to allowed Administrative Expense Claims and the Class 1, Class 7 and Class 8 claimants from operations and/or loans from officers of the Company.   Alternatively, the Debtor believes it will be able to reach agreements with the Administrative Expense Claims and/or the Wage Claims to pay a portion of the claims on the Effective Date and the balance over a reasonable period of time.

The Debtor's projections set forth in Exhibit C establish that the net operating income of the Debtor will be sufficient to make the payments required by the Plan.

The Plan should be read carefully and independently of this Disclosure Statement.   The following analysis of the Plan is intended to provide a context for understanding the remainder of the Disclosure Statement.   Unless otherwise indicated, the claims of all creditors are impaired to some extent.   The following is a brief description of the treatment of each of the classes of creditors and interest holders.

## CLASSIFICATION OF CLAIMS

The following is a designation of all classes of Claims and Equity Interests other than those Claims of a kind specified in Sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code.

Class 1            Unsecured Impaired Claims for Wages to the extent of $11,725 pursuant to 11 U.S.C. § 507(a)(4)(A) and (B).   Class 1 Wage Claims shall include claims for unpaid wages, including severance

14

pay or vacation pay earned but unpaid within ninety (180) days prior to the filing of the petition.

| | |
|---|---|
| <u>Class 2</u> | Allowed Secured Claims of Taxing Authorities |
| <u>Class 3</u> | Allowed Secured Claim of General Electric Capital Corporation |
| <u>Class 4</u> | Allowed Secured Claim of Sterling National Bank |
| <u>Class 5</u> | Allowed Secured Claim of US Bancorp Business Equipment Finance Group |
| <u>Class 6</u> | Allowed Secured Claim of CIT Technology Financings Services, Inc. |
| <u>Class 7</u> | Allowed Unimpaired claims of holders of unexpired equipment leases or executory contracts. |
| <u>Class 8</u> | Allowed impaired claims of unsecured creditors of the Debtor holding allowed claims of $1,000 or less and any creditors holding claims in excess of $1,000 electing to have their claim allowed in the amount of $1,000 in full satisfaction of their claims. |
| <u>Class 9</u> | Allowed impaired claims of unsecured creditors of the Debtor holding allowed claims excess of $1,000, the Class 9 claims shall include Allowed impaired claims of any taxing authority for penalties not related to actual pecuniary loss. |
| <u>Class 10</u> | Interest Holders |
| <u>Class 11</u> | Late Claims |

### **TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS**

As provided in Section 1123(a)(1) of the Bankruptcy Code, the Claims against the Debtor covered in Article III of the Plan are not classified. The holders of such Claims are not entitled to vote on the Plan.

#### **Allowed Administrative Expenses.**.

The holders of Allowed Administrative Claims of the type specified in Sections 507(a)(2) and 503(b) of the Bankruptcy Code claims shall receive Cash equal to the allowed amount of

such Claim or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such claims. Allowed Administrative Expense claims shall be paid in cash in full on the Effective Date or shall by paid upon such other terms as may be agreed upon by the respective holder of the claim for Administrative Expenses and the Debtor.

The   anticipated Allowed Administrative Claims are fee Claims of professionals retained by the Debtor and the Unsecured Creditors Committee.   All of the professional fees are subject to Bankruptcy Court approval.   A portion of the fees and expenses may be paid pursuant to interim fee applications filed by the professionals. The professionals retained by the Debtor include Law Office of Bonnie Bell Bond, LLC, who is the Debtor's bankruptcy counsel and its accountants, Causey Demgen & Moore. The Debtor will be filing an application to retain special counsel to assist it in patent matters. It is anticipated that the Unsecured Creditors Committee will also engage counsel.

As of the date of the filing of this Disclosure Statement, no interim fee applications have been filed by professionals retained in the case.   Unpaid fees and costs for bankruptcy counsel from the Petition Date through June 30, 2011 total approximately $28,000. Law Office of Bonnie Bell Bond, LLC, is holding a retainer in the amount of $11,810.   Law Office of Bonnie Bell Bond, LLC anticipates filing a fee application before Plan confirmation and applying the retainer to such approved fees and expenses from the retainer. Counsel projects that the fees and expenses incurred through confirmation of the plan will be $35,000. The fees and expenses of the accountants are projected to be $9,000.   The fees and expenses of patent counsel are projected to be $3,000. The Debtor is estimating that fees and expenses for counsel for the Creditors Committee will be $10,000.   The total fees and expenses for professionals are projected to be $57,000.

The Class 1 administrative expense claims will also include any allowed and unpaid post-petition obligation incurred by the Debtor in the operation of its business. The Debtor does not anticipate that there will be any additional allowed administrative expense claims.   The Debtor is meeting its post-petition obligations as they come due and is paying its tax and withholding obligations.

**Fees Due Under 28 U.S.C. §1930(a)(6)**.

The Reorganized Debtor shall make all payments required to be made to the United States Trustee program under 28 U.S.C. §1930(a)96) until the Chapter 11 Case is closed, converted, or dismissed.   All payments due to the United States Trustees program shall be paid on the Effective Date.   The United States Trustee shall thereafter be paid fees due on a quarterly basis until the Chapter 11 Case is closed converted or dismissed.

**Allowed Unsecured Priority Tax Claims**.

16

The holders of Allowed Tax Claims of the type specified in Section 507(a)(8) of the Bankruptcy Code for income taxes shall receive 100% of their Priority Claims.   Claims for penalties not related to actual pecuniary loss shall be treated under Class 8.

Allowed Tax Claims will be amortized and paid monthly over a five (5) year term with interest at the rate of 4% per annum.

The Debtor does not believe that there will be any Allowed Unsecured Priority Tax Claims.   The property and sales tax claims that have been filed are treated as secured tax claims under Class 2 of the Plan.   The Debtor does not believe that there will be any Allowed Unsecured Priority Income Tax Claims due to its net operating loss carry forwards.   The only unsecured priority tax claim which was filed in the case is an unassessed tax liability for the Colorado Department of Revenue for tax years 2009 and 2010.   Debtor believes that these taxes will be resolved by the filing of tax returns prior to the hearing on confirmation of the plan.

## TREATMENT OF CLAIMS IMPAIRED UNDER THE PLAN

### Class 1          Allowed Priority Wage Claims

Class 1 is comprised of the Allowed claims of employees of the Debtor for wages, vacation pay, severance up to the amount of $11,725 which were earned but not paid within one-hundred eighty (180) days prior to the filing of the petition.   Class 1 Claimants with allowed wage claims shall receive 100% of the wage portion of their claims up to a maximum of $11,725 per claimant on the Effective Date payable over six months starting on the Effective Date with interest at 6 percent per annum.   If Class 1 does not vote to accept the Plan, Class 1 claimants will be paid 100% of the wage portion of their claims up to a maximum of $11725 per claimant on the Effective Date without interest   Any allowed wage claims in excess of $11,725 or which were incurred prior to one-hundred eighty (180) days before the filing of the petition shall be treated as a Class 8 or 9 unsecured claim.   The amounts due to the Class 1 Claimants shall be offset by any obligations of the Claimants to the Debtor, including any and all payroll advances.

The Debtor has scheduled unpaid priority wage claims in the amount of $26,643.89. After offset of payroll advances, the Debtor believes that the Class 1 claims total $21,359. No additional wage claims were filed by employees.

### Class 2          Allowed Impaired Secured Claims of Secured Tax Claims.

Class 2 is comprised of the Allowed Secured Tax Claims Secured by the assets of the Debtor.   Any Allowed Class 2 Claims shall accrue interest at the rate of 12% per annum until paid in full.   Allowed Class 2 Claims shall be paid in sixty monthly installments commencing on the first day of the month following the Effective Date. The Class 2 Claims shall retain their

17

liens until paid in full.

The Debtor estimates that the Class 2 Claims total $13,668.04. Colorado Department of Revenue filed claim number 2 in the amount of $586.80 as a secured claim for sales taxes. Adams County filed Claim 12 for secured personal property taxes in the amount of $5,784.63 years 2009 and 2010.   Arapahoe County filed Claim 1 for secured personal property taxes in the amount of $7,296.61 for years 2005 and 2006.

**Class 3**             **Allowed Impaired Secured Claims of General Electric Capital Corporation**

Class 3 is comprised of the Allowed Impaired Claim of General Electric Capital Corporation ("GECC").   The Class 3 Claim arises from the Agreement between the Debtor and GECC dated April 27, 2007, Lease Agreement Number 8320243011 for a Teleois 74" V8 Printer including fume buster and Wasatch Teleios SoftRIP.   Although the agreement is entitled "Lease Agreement," the Debtor asserts that the agreement is a financing transaction for the purchase of the equipment and should be treated as a secured claim.

The Class 3 Claim is under secured.   The Class 3 claimant has asserted a prepetition claim in the amount of $46,401.21.   The estimated value of the equipment on the Petition Date was $15,000.00.   The Debtor has made adequate protection payments under the terms of the Stipulation for Adequate Protection approved by the Court in the amount of $_____.

The Allowed Secured Class 3 Claim shall be reduced to the value of the property in the amount of $15,000.00.   The Class 3 Claim shall be paid over thirty-six months with interest at the rate of 6% per annum with monthly payments commencing on the first day of the month following the Effective Date. The payments during the first six months following the Effective Date shall be $289 per month, the remaining balance shall be amortized and paid over the remaining 30 months. The Class 3 Claimant shall retain its lien on the equipment. The Debtor shall retain the equipment and shall continue to pay pursuant to the modified terms described herein.   Any deficiency amount shall be treated as a Class 9 unsecured claim.

In the event of any default by the Reorganized Debtor of any payment due to the Class 3 Claimant under this Plan, the Reorganized Debtor shall have fifteen (15) days within which to cure any default in payments due under this Plan after the date of issuance of written notice from the Class 3 Claimant. Written notice shall be provided to Reorganized Debtor and to Debtor's counsel. For purposes of this section, the notice to Debtor's counsel shall be served upon Law Office of Bonnie Bell Bond, LLC, 5613 DTC Parkway #1200, Greenwood Village, Colorado 80111 unless written notice of substitution of legal counsel is served upon the claim holder at least fifteen (15) days prior to the date notice is sent. In the event that Reorganized Debtor fails to cure any default in the requirements to make payment under the Plan, within fifteen days from the date that written notice is sent, the Reorganized Debtor shall be in default under the terms of the Plan and the Class 3 Claimant shall have the right to exercise its remedies under the Agreement, including repossession of the equipment.

In the event the Class 3 Claimant objects to the treatment proposed above, the Debtor shall request that the Bankruptcy Court set the proper fixed interest rate based upon the current market rate and value the collateral.   Based upon the Bankruptcy Court's determination with respect to the fixed interest rate and value of the collateral, the Debtor reserves the right to either (a) retain the collateral and pay pursuant to the modified secured claim and interest rate over sixty months, or (b) surrender such collateral to the Class 3 Claimant.   Any deficiency amount arising after a surrender of the collateral will be included in Class 9 of the Plan.

### Class 4            Allowed Impaired Secured Claims of Sterling National Bank

Class 4 is comprised of the Allowed Impaired Claim of Sterling National Bank.   The Class 4 Claim arises from the Agreement between the Debtor and KLC Financial dated December 13, 2006 for a Teleois 74" V8 Printer including fume buster and Wasatch Teleios SoftRIP.   Although the agreement is entitled "Lease Agreement," the Debtor asserts that the agreement is a financing transaction for the purchase of the equipment and should be treated as a secured claim.

The Class 4 Claim is fully secured.   The Class 4 Claimant has asserted a prepetition claim in the amount of $2,062.78.   The Class 4 Claimant has estimated value of the equipment on the Petition Date to be $5,000.00. The Debtor does not dispute this valuation.

The Allowed Secured Class 4 Claim shall be paid in full in 18 monthly installments with interest at the rate of 6% per annum with monthly payments commencing on the first day of the month following the Effective Date. The Class 4 Claimant shall retain its lien on the equipment. The Debtor shall retain the equipment and shall continue to pay pursuant to the modified terms described herein.

In the event the Class 4 Claimant objects to the treatment proposed above, the Debtor shall request that the Bankruptcy Court set the proper fixed interest rate based upon the current

19

market rate and value the collateral.    Based upon the Bankruptcy Court's determination with respect to the fixed interest rate and value of the collateral, the Debtor reserves the right to either (a) retain the collateral and pay pursuant to the modified secured claim and interest rate over 18 months, or (b) surrender such collateral to the Class 4 Claimant.    Any deficiency amount arising after a surrender of the collateral will be included in Class 4 of the Plan.

**Class 5**          **Allowed Impaired Secured Claims of US Bancorp Business Equipment Finance Group**

Class 5 is comprised of the Allowed Impaired Claim of US Bancorp Business Equipment Finance Group ("US Bancorp").    The Class 5 Claim arises from the Agreement between the Debtor and US Bancorp dated April 27, 2007, Lease Agreement Number 758265 for a Teleois 74" V8 Printer including fume buster and Wasatch Teleios SoftRIP.    Although the agreement is entitled "Lease Agreement," the Debtor asserts that the agreement is a financing transaction for the purchase of the equipment and should be treated as a secured claim.

The Class 5 Claim is under secured.    The Class 5 claimant has asserted a prepetition claim in the amount of $77,519.24.    The estimated value of the equipment on the Petition Date was $15,000.00.    The Debtor has made adequate protection payments under the terms of the Stipulation for Adequate Protection approved by the Court in the amount of $4,736.

The Allowed Secured Class 5 Claim shall be reduced to the value of the property in the amount of $15,000.00.    The Class 5 Claim shall be paid over thirty-six months with interest at the rate of 6% per annum with monthly payments commencing on the first day of the month following the Effective Date. The payments during the first six months following the Effective Date shall be $289, the remaining balance shall be amortized and paid over the remaining 30 months. The Class 5 Claimant shall retain its lien on the equipment. The Debtor shall retain the equipment and shall continue to pay pursuant to the modified terms described herein.    Any deficiency amount shall be treated as a Class 9 unsecured claim.

In the event of any default by the Reorganized Debtor of any payment due to the Class 3 Claimant under this Plan, the Reorganized Debtor shall have fifteen (15) days within which to cure any default in payments due under this Plan after the date of issuance of written notice from the Class 3 Claimant. Written notice shall be provided to Reorganized Debtor and to Debtor's counsel. For purposes of this section, the notice to Debtor's counsel shall be served upon Law Office of Bonnie Bell Bond, LLC, 5613 DTC Parkway #1200, Greenwood Village, Colorado 80111 unless written notice of substitution of legal counsel is served upon the claim holder at least fifteen (15) days prior to the date notice is sent. In the event that Reorganized Debtor fails to cure any default in the requirements to make payment under the Plan, within fifteen days from the date that written notice is sent, the Reorganized Debtor shall be in default under the terms of the Plan and the Class 3 Claimant shall have the right to exercise its remedies under the Agreement, including repossession of the equipment.

In the event the Class 5 Claimant objects to the treatment proposed above, the Debtor shall request that the Bankruptcy Court set the proper fixed interest rate based upon the current market rate and value the collateral.   Based upon the Bankruptcy Court's determination with respect to the fixed interest rate and value of the collateral, the Debtor reserves the right to either (a) retain the collateral and pay pursuant to the modified secured claim and interest rate over sixty months, or (b) surrender such collateral to the Class 5 Claimant.   Any deficiency amount arising after a surrender of the collateral will be included in Class 9 of the Plan.

**Class 6**            **Allowed Impaired CIT Technology Financing Services, Inc.**

Class 6 is comprised of the Allowed Secured Claim of CIT Technology Financing Services, Inc.   The Class 6 claim arises from a Lease Agreement entered into between Konica Minolta Business Solutions U.S.A., Inc., and the Debtor dated January 9, 2008 for a Konica Minolta C-253 Copier.   Although the agreement is entitled "Lease Agreement," the Debtor asserts that the agreement is a financing transaction for the purchase of the equipment and should be treated as a secured claim.

The Debtor believes that the Class 6 claim is under secured.   The Debtor has scheduled the Class 6 claim in the amount of $18,715.   The Debtor believes that the value of the copier is less than the claim owing to the Class 6 claimant.   The copier securing the Class 6 Claim shall be surrendered to the Class 6 claimant in full satisfaction of the secured claim.   Any deficiency amount arising after a surrender of the collateral will be included in Class 9 of the Plan.

**Class 7**            **Allowed Unimpaired claims of holders of unexpired equipment leases or executory contracts**.

Class 7 is comprised of the Claims of holders of unexpired equipment leases or executory contracts. The Debtor, prior to the hearing on confirmation, shall file motions to assume or reject its unexpired leases and executory contracts subject to the provisions of 11 U.S.C. §365 and notice under Fed. R. Bankr. P. 2002 and 6006. If the Debtor moves to assume its unexpired leases and executory contracts, the claims shall be treated in accordance with the order of the Court granting the assumption of the unexpired lease or contract. Any unexpired leases or executory contracts for which a Motion to Assume has not been filed by the Debtor prior to the hearing on confirmation shall be deemed rejected. If the leases or executory contracts are rejected the claims of the holders of those agreements are impaired.   Under the terms of the lease agreements, in the event that a lease is rejected, the equipment or property will be returned to the lessor, unless the Debtor and the lessor otherwise agree. Any Class 7 claimant asserting a claim for damages arising from rejection of a lease shall file a proof of claim with the Bankruptcy Court by the later of the Effective Date or thirty days after entry of the Order granting the Motion to Reject or the claim shall be forever barred.   The claims held by holders of rejected leases or executory contracts shall be treated as a Class 9 unsecured claims subject to

21

the limitations of Section 502 of the Code.

The Debtor believes that the only unexpired lease or executor contract is the contract with Mount Keen for Mr. Gerschman's services to the company.    The Debtor's pre-petition lease for its business premises expired by its terms during the Chapter 11 case.    The Debtor believes that its equipment lease agreements are all actually financing transactions and thus, the Debtor has separately classified and addressed treatment for these claims as secured creditors.

The amounts due under the Mount Keen agreement will be treated as Class 9 unsecured claims.    Mount Keen has verbally agreed to waive its right to require the Debtor to cure the pre-petition defaults on the assumption of the agreement conditioned upon confirmation of the Debtor's Plan of Reorganization. The waiver will be addressed in the Debtor's Motion to assume the contract.

**Class 8       Allowed impaired claims of unsecured creditors of the Debtor, holding allowed claims of $1,000 or less and any creditors holding claims in excess of $1,000 electing to have their claim allowed in the amount of $1,000 in full satisfaction of their claims.** Class 8 is the Administrative Convenience Class.    Unsecured creditors with allowed claims of $1,000 or less and unsecured creditors holding claims in excess of $1,000 electing to have their claim allowed in the amount of $1,000.    The treatment of the Class 8 Claims will depend upon whether the Plan is confirmed as a Consensual Plan or as a Cramdown Plan.

**Consensual Plan**.   In the event the Plan is confirmed as a Consensual Plan, the Class 8 Claimants shall receive 20% of their Allowed Claims within thirty days following the Effective Date. Creditors wishing to elect to have their claim treated under Class 8 shall make an election in writing to be received by undersigned counsel for the Debtor on or before the due date for tendering ballots to this Plan.

**Cramdown Plan.**     In the event the Plan is confirmed as a Cramdown Plan, the Class 8 Claimants shall be treated as Class 9 Claims and shall receive their pro rata share of the stock of the Reorganized Debtor to be issued on the Effective Date.

The Debtor projects that the Class 8 claims will total $8,651.20.    The Debtor is projecting that creditors holding claims between $1,000 and $1,400 will elect to be treated as Class 8 creditors.    A list of the projected Class 8 claims is attached hereto as Exhibit D.

**Class 9       Allowed impaired claims of unsecured creditors of the Debtor holding allowed claims in excess of $1,000, the Class 9 claims shall include Allowed impaired claims of any taxing authority for penalties not related to actual pecuniary loss**. Class 9 shall    be comprised of creditors holding allowed unsecured claims against the Debtor in excess of $1,000, including any allowed penalty claims held by any taxing authority which are not related to actual

pecuniary loss.      The treatment of the Class 9 Claims shall depend upon whether the Plan is confirmed as a Consensual Plan or as a Cramdown Plan.

**Consensual Plan.**    In the event the Plan is confirmed as a Consensual Plan, the Allowed Class 9 Claims shall receive their pro rata share of the Net Profits Fund, after payments to the Allowed Administrative Claims, Allowed Unsecured Priority Tax Claims, and Class 1 Wage Claims under the terms of the Plan.    The distributions from the Net Profits Fund shall continue for five years following the Effective Date.    Distributions to Class 9 Claimants shall not exceed the amount of the Allowed Claims plus interest calculated at six percent (6%) per annum. Distributions to the Allowed Class 9 Claimants shall commence thirty days following the close of the first full calendar quarter following the Effective Date and shall continue to be made thirty days following the close of each calendar quarter for the remaining term of the Plan.

**Cramdown Plan**. In the event the Plan is confirmed as a Cramdown Plan, the Allowed Class 9 Claims shall receive their pro rata share of the stock of the Reorganized Debtor to be issued on the Effective Date.    Under a Cramdown Plan, the Class 8 and Class 9 Claimants shall be treated as Class 9 Claimants.

Attached hereto as Exhibit E is a list of the Class 9 Claims. Exhibit E outlines claims which are disputed by the Debtor as well as other claims that are disputed by certain creditors in the case. The Class 9 claims, as filed, total $2,334,378.93 which includes disputed claims. If claims are disallowed based upon objections filed by the Debtor, the Creditors Committee or other parties in interest, the total amount of Allowed Class 9 claims will be reduced.

**Class 10**          **Interest Holders**    The treatment of the Class 10 Stockholders shall depend upon whether the Plan is confirmed as a Consensual Plan or as a Cramdown Plan.

**Consensual Plan**.    In the event that the Plan is confirmed as a Consensual Plan, the Class 10 Stockholders shall retain their stock in the Reorganized Debtor.

**Cramdown Plan.** In the event that the Plan is confirmed as a Cramdown Plan, the stock held by the Class 10 Stock Holders shall be canceled as of the Effective Date.

**Class 11**          **Late Claims**    Class 11 is comprised of all late filed claims against the Debtor.    The Class 11 claims shall be disallowed and shall receive no distribution under the Plan.

## DEFAULT AND PLAN MODIFICATION

In the event of any default by the Reorganized Debtor of any payment to any class of claimants arising under the terms of this Plan, Reorganized Debtor shall have forty-five (45) days within which to cure any default in payments due under this Plan after the date of issuance of written notice from any claim holder. Written notice shall be provided to Reorganized Debtor and to Debtor's counsel. For purposes of this section, the notice to Debtor's counsel shall be served upon Law Office of Bonnie Bell Bond, LLC, 5613 DTC Parkway #1200, Greenwood Village, Colorado 80111 unless written notice of substitution of legal counsel is served upon the claim holder at least fifteen (15) days prior to the date notice is sent.

In the event that Reorganized Debtor fails to cure any default in the requirements to make payment under the Plan, within forty-five days from the date that written notice is sent in compliance with paragraph 5.1 of the Plan, the Reorganized Debtor shall be in default under the terms of the Plan.

This default provision shall not apply to the Class 3 and 5 Claimants which shall be governed by the default and notice provisions set forth in the treatment of their claims.

In the event of default and failure by the Debtor to cure after compliance with the notice provisions in this Plan, creditors shall have the ability to pursue any rights they have under non-bankruptcy law to recover on their claims as modified by the provisions of this Plan.

At any time after Confirmation of the Plan but before substantial consummation of the Plan through the commencement of payments under the Plan, the Plan may be modified upon the request of the Reorganized Debtor, after notice and a hearing, only to the extent allowed by 11 U.S.C. § 1127.

## MEANS FOR THE IMPLEMENTATION AND EXECUTION OF THE PLAN

On or about the Confirmation Date, all assets of the Bankruptcy Estate shall be transferred to the Reorganized Debtor free and clear of all liens, claims, and interests of creditors, equity holders, and other parties in interest, except as otherwise provided herein. Specifically, the assets shall be transferred subject to any liens held by the Class 2, 3, 4, and 5 Claimants as discussed in the treatment of these claim. The Reorganized Debtor shall not, except as otherwise provided in this Plan, be liable to repay any debts which accrued prior to the Confirmation Date.   Except as provided in this Plan, on the Confirmation Date the Debtor and Debtor-in-Possession shall be granted a discharge under 11 U.S.C. § 1141.

The Debtor shall fund its Plan obligations with cash from operations.   Such funds shall be sufficient to pay in full all amounts due on the Effective Date.

24

Thirty days after the Effective Date, the Debtor shall implement its Plan of Reorganization pursuant to the terms for each class of claimants set forth above. The treatment of Classes 8, 9 and 10 depends upon whether the Plan is confirmed as a Consensual Plan or by Cramdown.   In the event of a Consensual Plan, payments under the Plan shall come from the cash flow of the Reorganized Debtor generated by the Reorganized Debtor's business. On the due date for payments and set forth in Articles III and IV of the Plan, the Reorganized Debtor shall immediately distribute the required pro rata amount to each claimant holding an Allowed Secured or Unsecured Claim and escrow the same pro rata amount to creditors holding Contested Claims as provided in Article X the Plan.

Within fifteen (15) days following the Effective Date, the Reorganized Debtor shall serve notice upon the Class 8 and 9 Claimants and Class 10 Interest Holders advising them that the Plan of Reorganization has been confirmed and advising them as to whether the Plan was confirmed by Cram down or as a Consensual Plan.

In the event the Plan is confirmed as a Consensual Plan, within thirty (30) days following the Effective Date, the Reorganized Debtor shall make distributions to the holders of Class 8 Allowed Claims, or those who elect to be treated under Class 8 in cash in full and complete satisfaction of their claims against the Estate.   In the event that the Debtor contests or disputes the claim of any creditor who made a timely election, the Debtor shall commence a proceeding with the Bankruptcy Court to contest the Claim within thirty days following the Effective Date and shall escrow the funds otherwise payable to the disputed claimant pending resolution of the Contested Matter in accordance with the provisions of Article X of the Plan.

In the event that the Plan is confirmed as a Consensual Plan, within thirty days, following the close of each quarter, the Debtor shall calculate its Net Profits and deposit fifty (50) percent of the Net Profits into the Net Profits Fund for distribution to the Class 9 Claimants.

In the event that the Plan is confirmed as a Consensual Plan, the Reorganized Debtor shall make quarterly distributions of the amounts to the Allowed Class 9 Claimants from the Net Profits Fund. The distributions of Net Profits shall commence thirty days following the close of the first full Calendar Quarter following the Effective Date.

In the event that the Plan is confirmed as a Consensual Plan, distributions to the Class 9 Claimants shall be mailed by the 30th day of the month following the close of the calendar quarter. The Reorganized Debtor shall provide Class 9 creditors with the calculation of the Net Profits for the calendar quarter.

In the event the Plan is confirmed as a Cramdown Plan, the Debtor shall void the existing stock held by the Class 10 Shareholders as of the Effective Date and shall issue stock in the Reorganized Debtor to the Allowed Class 8 and 9 Claimants on a pro rata basis.   The shares of stock shall be issued and distributed within thirty days of the Effective Date. The stock to be

25

issued on account of Contested Claims, shall be held in escrow pending allowance of the claims through entry of a Final Order.   The percentage of stock to be held in escrow shall be determined by the amount of the claim determined in the estimation proceedings.

The Reorganized Debtor's financial records shall be available for review by creditors upon reasonable notice during normal business hours subject to execution of an appropriate confidentiality agreement.

The Reorganized Debtor may pursue any claims or recovery actions held by the Debtor, including but not limited to recovery under 11 U.S.C. §§544, 547, 548 and 549.   The recovery from any actions, after payment of legal fees and expenses associated with such actions, shall be included in the calculation of Net Profits. The Reorganized Debtor may abandon any claim it has against any third party if it determines that the claim is burdensome or of inconsequential value and benefit. The Reorganized Debtor is authorized to employ counsel to represent it in the litigation or any cause of action or claims held by the Debtor.

All funds held by the Reorganized Debtor for distribution under the Plan shall be held in accounts which are insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States.

Following the Effective Date, the Reorganized Debtor may compromise objections to Claims or causes of action referred to in this Plan without notice and hearing for claims or causes of action asserted in the original amount of $50,000 or less. Settlements or compromises of any claims or causes of action asserted in the amount of $50,000 or more shall be subject to notice and an opportunity for hearing under the provisions after notice in compliance with the Local Rules of Bankruptcy Procedure.

After the Effective Date, the Reorganized Debtor exercising its business judgment may sell, operate or abandon any of its assets.

The Reorganized Debtor shall receive a discharge to the extent permitted by 11 U.S.C. § 1141 and the Reorganized Debtor shall be entitled to seek injunctive relief from the Court, if necessary, to enforce any and all provisions of the Plan.

## **EFFECT OF CONFIRMATION**

Upon Confirmation, the provisions of this Plan shall bind the Debtor and any creditors of the Debtor, whether or not the Claim of such Person is Impaired under the Plan and whether or not such Person has accepted the Plan.   Upon Confirmation, all of the property of the Debtor's estate shall be vested in the Reorganized Debtor as provided in this Plan, free and clear of all Claims, except as specifically provided in the Plan.   Upon Confirmation, all creditors are

permanently enjoined from commencing or pursuing any action against the Reorganized Debtor, other than an action to enforce the provisions of the Plan.

## PROVISION FOR ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS

All unexpired leases and executory contracts between the Debtor and any other party which have not prior to the hearing on confirmation of the Plan been affirmatively assumed by the Debtor by the filing of an appropriate motion are hereby rejected.

### PROVISION AS TO CONTESTED CLAIMS

The deadline for parties in interest to file objections to claims is sixty (60) days after the Effective Date. The Bankruptcy Court shall have the authority to extend this deadline upon the filing of a motion within the provisions of Fed. R. Bankr. P. 9006.   In the event that the deadline is extended, claims shall not be deemed an Allowed Claim until after the expiration of the extension.

Upon the filing of such objection or service of said written notice, such claim shall be considered a Contested Claim, and any cash or other instruments or property otherwise distributable to such creditor under the Plan shall be held by the Debtor in escrow until final disposition of the objection to the claim either by settlement or entry of a Final Order. If the claim is only contested in part, distribution shall be made to the claimant on the uncontested portion under the provisions of the Plan and the balance shall be treated as a Contested Claim. If the objection is overruled or denied, in whole or in part, or the claim is allowed by stipulation of the Reorganized Debtor and the claimant, such claimant shall receive the amount of cash or stock provided in the Plan to the extent of the amount of the claim finally allowed, including back installments.

From and after the Effective Date, Reorganized Debtor shall reserve and hold for the benefit of each holder of a Contested Claim cash in an amount equal to the pro rata payments which would have been made to the holder of such contested claim if it were an Allowed Claim in an amount equal to the lesser of:   (i) the amount of the Contested Claim or (ii) the amount in which the Contested Claim shall be estimated by the Bankruptcy Court pursuant to § 502 of the Bankruptcy Code for purposes of allowance, which amount shall constitute and represent the maximum amount in which such claim may ultimately become an Allowed Claim.   No payments or distributions shall be made with respect to all or any portion of any Contested Claim pending the entire resolution thereof by Final Order.

### AMENDMENT OF ARTICLES OF INCORPORATION AND BYLAWS OF DEBTOR

As may be required, the Articles and Bylaws of the Debtor shall be amended on or before the Effective Date to the extent necessary to effectuate the provisions of the Plan.

*Board of Directors and Annual Shareholders Meeting.*

The current Board of Directors shall serve until the next annual or special meeting of shareholders, called in accordance with the Bylaws.

**MISCELLANEOUS PROVISIONS**

*Retention of Jurisdiction*

The Court shall retain jurisdiction over this Chapter 11 case and related core and non-core proceedings, for the following purposes:

(a)     To hear and determine any and all objections to the allowance of claims or interests.

(b)     To determine any and all applications for allowances of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Code or the Plan, to the extent such claim was incurred prior to the Effective Date.

(c)     To hear and determine any and all pending applications for the rejection or assumption, or for the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which the Debtor is party, and to hear and determine any and all claims arising therefrom.

(d)     To hear and determine any and all applications, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or that the Debtor or Reorganized Debtor may be pending on the Effective Date or instituted by the Reorganized   Debtor thereafter.

(e)     To consider any modifications of the Plan, to remedy any defect or omission or reconcile any inconsistency in the Plan or in the orders of the Bankruptcy Court, including the Order of Confirmation.

 (f)     To hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan.

28

(g)     To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor where the original claim or cause of action is in excess of $50,000.

(h)     To issue orders in aid of execution of the Plan as contemplated by § 1142 of the Bankruptcy Code.

(i)     To extend the deadlines set forth in this Plan under Fed. R. Bankr. P. 9006.

(j)     To determine such other matters as may be set forth in the Order or Confirmation or which may arise in connection with the Plan or the Order of Confirmation.

*Vesting of Property*

Reorganized Debtor, subject to its obligations under this Plan, shall be vested with ownership to all property of the estate except as otherwise provided herein upon the Effective Date.

*Satisfaction of Claims*

The payment of Allowed Claims, Allowed Administrative Claims and Allowed Secured Claims shall be in exchange for all claims against the Debtor and shall constitute full settlement, release, discharge, and satisfaction of all such claims against the Debtor.   Confirmation of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan, as set forth in the Plan.   Any obligation or note, previously in default, so modified, shall be cured as modified as of the Confirmation Date.

*Pre-Existing Causes of Action.*

Nothing herein contained shall prevent the Reorganized Debtor from taking any action as may be necessary to the enforcement of any cause of action which may exist on behalf of the Reorganized Debtor and which may not have been enforced or prosecuted by the Debtor prior to the Effective Date.

*Reservation of Rights*

The Reorganized Debtor reserves the right to modify the Plan prior to the Confirmation, and thereafter to modify the Plan in accordance with 11 U.S.C. § 1127(b) and ¶ 5.3 herein.

*Headings*

The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affected the meaning and interpretation of the Plan.

*Notices*

All notices, request, demands, or other communications required or permitted in this Plan must be given in writing to the parties to be notified.   All communications will be deemed when delivered when received at the following addresses:

> (a)      To Debtor:
> Kolorfusion International, Inc.
> 5401 Oswego Street, Unit C
> Denver, Colorado 80239
>
> With a copy to
> Bonnie Bell Bond, Esq.
> Law Office of Bonnie Bell Bond, LLC
> 5613 DTC Parkway, Suite 1200
> Greenwood Village, Colorado 80111
>
> (b)      To an allowed claimant, at the addresses set forth in the allowed Proof of Claim, if filed, or, if no Proof of Claim is filed, at the address set forth for the claimant in the Debtor' Schedules filed with the Bankruptcy Court.

*Successors and Assigns*

The Plan will be binding upon the Reorganized Debtor, any creditor affected by the Plan, their heirs, successors, assigns and legal representatives.

*Unclaimed Payments*

If a Person entitled to receive a payment or distribution pursuant to the Plan fails to negotiate a check, accept a distribution or provide a forwarding address in the event notice cannot be provided as set forth in paragraph 10.7 of the Plan, within one (1) year of the Effective Date, the person or entity is deemed to have released or abandoned any right to payment or distribution under the Plan.

*Liability*

Except as set forth in this Plan,   the Reorganized Debtor,   shall not have or incur any liability for any past, present or future actions taken or omitted to the taken under, in connection

30

with, related to, affecting or arising out of the Chapter 11 Case or this Plan except for claims based on gross negligence or willful misconduct.

## VIII.   ANALYSIS OF CLAIMS

Under the Bankruptcy Code, a creditor may be able to participate in an estate whether or not a Proof of Claim has been filed, provided the Debtor has not scheduled the claim as disputed, contingent or unliquidated.   The Bankruptcy Court has set a bar date for filing proofs of claim of January 28, 2011. If you did not timely file a proof of claim, your claim under the Plan will be the amount set forth in the Debtor's Schedules of Assets and Liabilities.   If your claim was scheduled as disputed and you did not timely file a proof of claim, you will not have an Allowed Claim against the estate.

As of the date of this Disclosure Statement, and to the best of the Debtor's knowledge, the following is an estimate of the total claims which are reflected in the Schedules, and amendments filed with the Bankruptcy Court and the amounts which will be paid pursuant to the Plan.

| CLASS | TYPE OF CLAIM | TOTAL AMOUNT CLAIMED | PAYMENT PROPOSED UNDER PLAN |
|---|---|---|---|
| Not Classified | Administrative Expense Claims | | Paid by the Effective Date or within reasonable time following Court Order approving claim unless otherwise agreed to between the parties. |
| Not Classified | Unsecured Priority Tax Claims | None – Debtor projected unassessed liability will be resolved by confirmation | Paid by the Effective Date |
| 1 | Wage Claims | $26,643.89 | If accepting class paid over 6 months with interest at 6% per annum.   If class does not accept paid in full on the |

| | | | |
|---|---|---|---|
| | | | Effective Date. |
| 2 | Allowed Secured Tax Claims | $13,668.04 | Secured claim Amortized over 60 months and paid with interest at 12% per annum |
| 3 | General Electric Capital Corporation | $46,401.21 | Secured claim valued at $15,000.00 payable in 36 monthly installments with interest at 6%. Payments of $289 for the first six months with the balance paid over 30 months. Deficiency treated as Class 9 |
| 4 | Sterling National Bank | $2,062.78 | Treated as fully secured payable in 18 monthly installments with interest at 6%. |
| 5 | US Bancorp Business Equipment Financing Group | $77,519.26 | Secured claim valued at $15,000.00 payable in 36 monthly installments with interest at 6%. Payments of $289 for the first six months with the balance paid over 30 months. Deficiency treated as Class 9 |
| 6 | CIT Technology Financing Services, Inc. | 25,144.54 | Equipment surrendered in satisfaction of secured claim. |

|  |  |  | Deficiency treated as Class 9. |
|---|---|---|---|
| 7 | Unexpired leases and executor contracts |  | Treated in accordance with motion |
| 8 | Unsecured claims of $1000 or those holding larger claims who elect to have their claims allowed in amount of $1000Unsecured Claims | $8,651.20 projected | Treatment depends on on whether consensual or cramdown. Consensual Plan paid 20% within 30 days of Effective Date. Cramdown plan receive pro rata share of stock in Reorganized Debtor with Class 9 claims. |
| 9 | Unsecured Claims of $1,000 or greater | $2,334,378.93 as filed. Exhibit E outlines claims that are disputed either by the Debtor or other parties in interest. | Treatment depends on whether consensual or cramdown plan. Consensual plan receive pro rata share of Net Profits distributions. Cramdown plan receive pro rata share of stock in Reorganized Debtor. |
| 11 | Interest Holders |  | In consensual plan retain shares in cramdown plan stock voided. |

   The treatment of the Class 8 and 9 Creditors depends upon whether the Plan is confirmed as a Consensual Plan or as a Cramdown Plan.   Under a Consensual Plan, the Allowed Class 9 unsecured claims share on a pro rata basis in the distribution from the Net Profits Fund.

The Allowed Class 9 unsecured claims share on a pro rata basis in the distribution from the Net Profits Fund. The Debtor projects that the distributions to the Allowed Class 9 Creditors, over the life of the Plan, will total 20% of allowed claims. See Projections set forth as Exhibit C. The schedule of Class 9 creditors, is attached hereto as Exhibit E. The 20% projection is based upon the claims as filed.   If claims are disallowed based upon objections by the Debtor or any other parties in interest, the percentage distributions to the remaining creditors would increase.

## IX.    LIQUIDATION ANALYSIS

| **ASSETS (As of July 28, 2010**) | **Scheduled Value** | **Current Liquidation Value** |
|---|---|---|
| Petty Cash | 66.23 | 66.23 |
| Checking Account - Chase Bank | 15,792.58 | 15,792.58 |
| Payroll Account - Chase Bank | 770.26 | 770.26 |
| Security Deposit for 16075 E. 32nd Avenue, #A Aurora, Colorado 801111 | 9,600.00 | 0 |
| ACCOUNTS RECEIVABLE | $242,345.96 | $79,245.45[2] |
| PATENTS | unknown[3] | $125,000.00[4] |
| 1995 Cargo Truck | $2,000.00 | $500.00 |
| OFFICE FURNITURE - 6 desks, 2 couches, conference table and chairs, 8 computer, 3 tables, fax machine and miscellaneous office supplies | $3,500.00 | $1,075.00 |
| MANUFACTURING EQUIPMENT including conveyerized production oven, 2 gas revent ovens, 1 electric oven, 2 heat presses, 1 fork lift, | $26,600.00 | $23,230.00 |

2  In estimating the liquidation value of the receivables, the Debtor has written off $31,509 which it believes is not collectible.   The Debtor estimates that in a liquidation, 50% of its remaining receivables would be collected by a Chapter 7 trustee.

3  The original book value placed on the patents was $3,692,530. The Debtor scheduled the patents in its Schedule B as having an unknown value.   The Debtor does not believe that the book value is a realistic value of the patents particularly given the fact that the patents expire between 2012 and 2018 and the Debtor has never generated the revenues utilizing the patents that were originally projected by Mr. Nagel when the patents were acquired.

4  The Debtor has estimated the value of its patents in a liquidation at $25,000 per patent.

| | | |
|---|---|---|
| 2 sewing machines 1 powder booth, 1 small electric oven, 1 air compressor, 1 sand blaster, 1 strip tank, 1 pad printer, various power tools, various hand tools, 2 pallet jackets, 17 production tables 2 arc units, racking 10 baking racks with trays | | |
| INVENTORY | $144,989.77 | $18,000.00 |
| PREFERENCE RECOVERIES | | 6,539.00 |
| TOTAL VALUE | | $270,218.52 |
| Less Estimated Chapter 7 Trustee Fees | | $ 16,760.93 |
| Less Estimated Chapter 7 Professional Fees | | $ 10,000.00 |
| Less Unpaid Chapter 11 Administrative Claims | | $45,000.00 |
| Less Lease Rejection Damages | | $202,058.97 |
| VALUE AFTER ADMINISTRATIVE CLAIMS | | $ 6,398.62 |
| Priority Wage Claims | | $26,643.89 |
| Priority Tax Claims | | $0 |
| Value for Unsecured Claims | | $0 |

The Debtor has estimated that the liquidation value of its patents is $125,000 or $25,000 a piece. Debtor has consulted with patent counsel in estimating liquidation value. Counsel as advised that in situations such as the Debtor's patents, patents are frequently valued at the administrative costs for filing a patent application. $25,000 is a standard administrative cost for filing a patent application. Given the fact that the patents are due to expire, some as soon as November 2012, the Debtor estimates that a buyer of the patents at auction would not pay much more on average than the standard administrative expense.   In estimating the liquidation value of its patents, the Debtor has taken into consideration the nine license agreements it has with licensees.   Each of the license agreements provide that the licensees are to pay an annual fee plus a royalty. The license agreements are very dependent upon the services provided by Kolorfusion and its know-how which wouldn't be available to the purchaser of the patents in a liquidation.   The license agreements contain provisions which enable the licensees to terminate the agreement on notice if they stop using the technology. Of the nine license agreements, the

Debtor believes that only one would continue to utilize the patents and technology without the services and Know-How provided by the Debtor's employees.    The income generated from that licensee is $10,000 year.    The discounted value of the income stream from that license is less than the projected liquidation value of the patents.

In a liquidation, the Debtor projects that the fees to be paid to a trustee under the Bankruptcy Code will be allowed at the statutory maximum set forth in Section 326 of the Code. The Debtor further projects that the Chapter 7 Trustee will incur professional fees for accounting and legal services of at least $10,000.

The Debtor believes that there will not be a distribution to unsecured creditors in a liquidation.    In a liquidation, the Debtor believes that the administrative expenses will exceed the liquidation value of the assets.    Due to the expiration of its real estate lease, the Debtor was required to enter into a new lease for its premises.    The Court has entered an Order approving the terms of its new lease.    In a liquidation, the Debtor will breach its lease with the landlord. The total due under the new lease is $527,627.13, including estimated minimum common area charges. While the landlord will be required to mitigate its damages, the property was vacant for over two years before the Debtor leased the property.    Therefore, the Debtor projects that the lease claims from the rejection of the lease will be at least two years rent or $202,058.97. In addition, there will be unpaid administrative expense claims from professionals. These are projected to be at least $45,000, comprised of $23,000 for the projected balance of legal counsel's fees, $9,000 projected fees for the accountants in completing the tax returns, $3,000 for the fees of patent counsel and estimated fees for Creditor's Committee Counsel of $10,000. The Debtor projects that the funds from a Chapter 7 liquidation will not be sufficient to pay the administrative and allowed wage claims. The Debtor projects that there will not be a distribution to unsecured creditors in a liquidation.

The Debtor believes that confirmation of the Plan is in the best interests of creditors as it provides them with payment projected to be at least 20% percent of the claims and provides substantially more to them than they would receive in a liquidation.

Another alternative to conversion is a sale of the Debtor's assets as a going concern under Section 363 of the Bankruptcy Code. In a sale under Section 363 of the Bankruptcy Code, the assets are sold to a buyer, free and clear of liens, claims and interests. Normally a sale under Section 363 of the Bankruptcy Code involves competitive bidding for the assets.    The ultimate buyer of the assets normally has the right to choose which of the Debtor's leases, equipment loans, etc, it wishes to assume. Any agreements that aren't assumed are rejected and their damages are included in the unsecured creditors class.    The administrative expenses that would exist in a Chapter 7 would also exist in a Section 363 sale, unless the buyer was willing to assume the Debtor's real property lease.    At this point, the Debtor has not engaged the services of a broker to assist in a sale of the assets under Section 363 of the Bankruptcy Code.

36

Another alternative to conversion is dismissal of the Bankruptcy case.   If the case is dismissed, the litigation claimant will proceed with the litigation that caused the filing of the case.   If he is able to obtain a judgment, he will take action to seize the assets of the Debtor which will impair the ability of the Debtor to operate and will force the shut down of the Debtor's operations.

## XI.        RISK FACTORS

There is no assurance that the creditors will be repaid.   The following are some of the risk factors which should be considered in evaluating the Plan and Disclosure Statement.   The following should not be considered as an exhaustive list of the risk factors to be considered in evaluating the Plan.

### General Economic Risk

The Reorganized Debtor's business may be affected by the general conditions in the economy.

### Risk of Inability to Perform

The Debtor's Plan obligates the Debtor to make monthly payments for debt service.   The Debtor believes that it will generate profits and will have sufficient funds to make the distributions as discussed herein.   However, in the event that expenses exceed revenues, the Debtor may not have sufficient revenue to meet its obligations under the Plan.

### Competition

While there presently is no direct competition with the Debtor, its patents are due to expire between November, 2012 and June, 2018.   Once the patents expire there may be increased competition as other entities are able to start utilizing similar processes.   There are risks that the Debtor's revenues will not be as estimated due to increased competition or a reduction in prices from competition.

### Loss of Key Employees

The Debtor believes that its business is dependent upon the experience and reputation of key employees to restructure and reorganize the business.   The Debtor's ability to operate and perform may be severely impacted by the loss or inability of key employees to perform their services.

## XII.      CONSIDERATIONS IN VOTING ON THE CHAPTER 11 PLAN

### 1.      Operations in Chapter 11.

Chapter 11 of the Bankruptcy Code permits the adjustment of secured debts, unsecured debts and equity interests.   A Chapter 11 plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness or may provide for return to equity owners absent full satisfaction of indebtedness so long as no impaired class votes against the Plan.

If an impaired class votes against the Plan, this does not necessarily make implementation of the Plan impossible so long as the Plan is fair and equitable, that class is afforded certain treatment defined by the Bankruptcy Code, and at least one impaired class of creditors votes to accept the Plan by a two-thirds majority in the dollar amount of claims voting and a majority in number of claims voting.   In order to be fair and equitable with respect to the unsecured creditors, the Plan must either provide the creditor the full value of his claim or if he does not receive the full value of the claim, no junior class of creditor or interest holder may receive or retain anything on account of their claim or interest.

In the event a class is unimpaired, it is automatically deemed to accept the Plan.   A class is unimpaired, in essence, if:   (1) its rights after confirmation are the same as what existed (or would have existed absent defaults) before the commencement of the Chapter 11 case and any existing defaults are cured or provided for and the class is reimbursed actual damages; or (2) the allowed claims of the class are paid in full in cash as though matured.

If there is a dissenting class or objection by a creditor, the test for approval by a court of a Chapter 11 Plan (i.e. confirmation) is whether the Plan is in the best interests of creditors and is feasible.   In simple terms, a Plan is considered by the Court to be in the best interest of creditors if the Plan will provide a recovery to the creditors of not less than they would obtain if the Debtor were liquidated and the proceeds of liquidation were distributed in accordance with the bankruptcy liquidation (Chapter 7 priorities).   In this case, the unsecured **creditors will receive more under the Plan than what they would receive in a liquidation and all senior classes of creditors are either unimpaired or have agreed to different treatment under the Plan.**

These determinations by the Court will occur at the hearing on confirmation after a Plan has been accepted by the creditors. The Court's judgment on these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one.

The Debtor anticipates that the Plan will be confirmed with the consent of all classes of creditors., however, the Debtor will request that the Plan be confirmed by cramdown if the unsecured creditors reject the Plan.   The Debtor believes that the Plan meets the requirements of the absolute priority rule and will be prepared to address these issues at the hearing on confirmation of the plan, if necessary.

### 2.      Allowed Claims.

While the Plan provides for certain payments on the Effective Date, such payments will only apply to allowed claims.   Under the Bankruptcy Code, a claim may not be paid until it is allowed.   A claim will be allowed in the absence of objection.   Once an objection to a claim has been filed, the claim and objection thereto will be heard by the Court at a regular evidentiary hearing and allowed in full or in part or disallowed.   While the Debtor bears the principal responsibility for claims objections, any interested party, including creditors, may file claim objections.   Accordingly, payment of some claims may be delayed until objections to such claims are ultimately settled.

### 3.      Disclosure Required by the Bankruptcy Code.

The Bankruptcy Code requires disclosure of certain facts:

(a)      There are no payments made or promises of the kind specified in Section 1129(a)(5)(A) of the Bankruptcy Code which have not been disclosed to the Court.

(b) **The Reorganized Debtor will remain in control of the assets after confirmation of the Plan for the purpose of operating the business of the Reorganized Debtor.   The current management of the Debtor will remain in control of the Reorganized Debtor.      The compensation and potential bonuses to be paid to management are disclosed in Exhibit C attached hereto. The Debtor believes that their continued control is in the best interest of all creditors as described in Section 1129(a)(5) of the Bankruptcy Code.**

### CONCLUSION

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan of Reorganization in an informed fashion.   Since, if the Plan is confirmed, you will be bound by its terms, you are urged to review this material and make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

Dated this __15th____ day of July, 2011.

KOLORFUSION INTERNATIONAL, INC.

By:__/s/ Thomas Gerschman_____ _____

Thomas Gerschman, Chairman

LAW OFFICE OF BONNIE BELL BOND, LLC

By: _____ */s/ Bonnie Bell Bond* _____
Bonnie Bell Bond, #14923
5613 DTC Parkway, Suite 1200
Greenwood Village, Colorado 80111
Phone:   303-770-0926
Fax:   303-770-0965
bonnie@bellbondlaw.com
COUNSEL FOR THE DEBTOR IN POSSESSION